UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

UNITED STATES OF AMERICA,

                Plaintiff,

                                        **OPINION & ORDER**

       -against-                         **CV-05-3971(SJF)**

ALL FUNDS ON DEPOSIT IN, OR TRANSFERRED
TO OR THROUGH, BANC OF AMERICA ACCOUNT
NUMBER 207-00426 HELD IN THE NAME OF
KENNETH V. JAEGGI AND PATTI S. JAEGGI UP TO
AND INCLUDING THE SUM OF $11,754.23, AND ALL
PROCEEDS TRACEABLE THERETO,
32,397 SHARES, STOCK CERTIFICATES,
WARRANTS AND/OR OPTIONS OF SYMBOL
TECHNOLOGIES, INC. ON DEPOSIT IN, OR
TRANSFERRED TO OR THROUGH, BANC OF AMERICA
ACCOUNT NUMBER 207-00426 HELD IN THE NAME OF
KENNETH V. JAEGGI AND PATTI S. JAEGGI, AND
ALL PROCEEDS TRACEABLE THERETO;
ALL FUNDS ON DEPOSIT IN, OR TRANSFERRED
TO OR THROUGH BANC OF AMERICA ACCOUNT
NUMBER P62-032115 HELD IN THE NAME OF
KENNETH V. JAEGGI AND PATTI S. JAEGGI UP TO
AND INCLUDING THE SUM OF $20,37.95, AND
ALL PROCEEDS TRACEABLE THERETO;
ALL SHARES, STOCKS CERTIFICATES, WARRANTS
AND/OR OPTIONS ON DEPOSIT IN, OR TRANSFERRED
TO OR THROUGH, BANC OF AMERICA ACCOUNT
NUMBER P62-032115 HELD IN THE NAME OF
KENNETH V. JAEGGI AND PATTI S. JAEGGI, AND
ALL PROCEEDS TRACEABLE THERETO;
CERTIFICATE OF DEPOSIT HELD IN BANK OF
AMERICA ACCOUNT NUMBER 91000039767747,
HELD IN THE NAME OF KENNETH JAEGGI, AND
ALL PROCEEDS TRACEABLE THERETO,

                Defendants-in-rem.
--------------------------------------------------------X
FEUERSTEIN, J.

1

On May 28, 2004, the United States of America (the government) filed an eighty-seven (87) page indictment against Kenneth Jaeggi (Jaeggi), charging him with, *inter alia*, securities fraud, 15 U.S.C. §§ 78j(b), 78ff; wire fraud, 18 U.S.C. § 1343; mail fraud, 18 U.S.C. § 1341; and conspiracy, 18 U.S.C. § 371. The indictment also indicated that the government would seek forfeiture of certain of Jaeggi's assets upon his conviction pursuant to 18 U.S.C. § 981(a)(1)(C) (authorizing civil forfeiture for mail, wire, and securities fraud proceeds) and 28 U.S.C. § 2461(c) (authorizing criminal forfeiture where civil forfeiture is authorized).

On August 19, 2005, the government commenced this civil forfeiture action pursuant to, *inter alia*, (1) 18 U.S.C. § 981(a)(1)(C), contending that the seized property constituted, or was derived from, proceeds traceable to securities fraud (15 U.S.C. §§ 78j(b) and 78ff), mail fraud (18 U.S.C. § 1341) or wire fraud (18 U.S.C. § 1343), or a conspiracy to commit such offenses; and (2) 18 U.S.C. § 981(a)(1)(A), contending that the seized property was involved in, or was traceable to, a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 or 1957 (the money laundering statutes). On that same date, the court issued a summons and warrant for arrest of defendants-in-rem, pursuant to Supplemental Rule C(3) of the Supplemental Rules for Certain Admiralty and Maritime Claims (the Supplemental Rules).

On or about October 28, 2005, Jaeggi filed a motion to dismiss the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. During a court conference on December 19, 2005, Judge Wexler orally denied the motion to dismiss without prejudice. Thereafter, Jaeggi renewed his motion to dismiss pursuant to Rule 12(b)(6). By order dated July 16, 2007, I denied Jaeggi's renewed motion to dismiss. Thereafter, by order dated September 19, 2007, I denied Jaeggi's motion for reconsideration. At a conference the following day, Jaeggi moved for

the release of those restrained assets which are not traceable to the alleged criminal conduct or on the basis, *inter alia*, that he is unable to cover his living expenses and tax obligations.

II     DISCUSSION

    A.     The Restrained Shares of Symbol Stock

Jaeggi contends that the thirty-two thousand three hundred ninety-seven (32,397) shares of Symbol Technologies Inc. (Symbol) stock that were initially restrained in Bank of America account number 207-00426 (the Symbol shares) cannot be traced to the fraud alleged in the complaint against Jaeggi.[1] According to Jaeggi, although the government claims that these Symbol shares can be traced to stock option exercises occurring in February 2000, June 2000 and May 2001, the complaint is devoid of any further detail regarding which of the shares can be traced to which stock option. Moreover, Jaeggi contends that he had a right to the Symbol shares prior to the time of the alleged fraud because he obtained the stock by exercising the options awarded to him when he joined Symbol in 1997, a year prior to any of the alleged criminal conduct. Therefore, according to Jaeggi, the cash proceeds of the Symbol shares must be released.

Initially, it is noted that Jaeggi's argument is just another attempt to reargue his prior motion to dismiss which I denied by order dated July 16, 2007 (and which itself was an order on reargument of Judge Wexler's prior order denying dismissal), and for which I denied reargument by order dated September 19, 2007. As noted in the July 16, 2007 order, the initial complaint,

---

[1] According to Jaeggi, in January 2007, the Symbol shares were liquidated and converted to cash as a result of the merger between Symbol and Motorola, Inc. The cash proceeds are currently (under restraint) in an interest-bearing account at Bank of America.

3

*inter alia*, outlines how the government traced the proceeds of Jaeggi's alleged unlawful activities to the defendants-in-rem, including the Symbol shares at issue here, and includes allegations that Jaeggi exercised stock options and sold Symbol stock during the relevant period. (Compl., ¶¶ 46-57). As noted in my prior orders, more detailed allegations such as which of the shares can be traced to which stock option are not required at this stage of the litigation and, in any event, are irrelevant, since it is alleged that all of the restrained shares resulted from Jaeggi's exercise of stock options during the relevant period and constitute criminal proceeds.

Moreover, contrary to Jaeggi's contention, the fact that he obtained a stock option to purchase the shares prior to the relevant period does not preclude restraint of the Symbol shares. A stock option is merely a right to buy shares of stock at a specific price or within a specified period. See 5A Fletcher Cyc. Corp. § 2137.30. A stock option does not vest in the holder of the option any interest or right in the stock. 12A Fletcher Cyc. Corp. § 5575. Thus, Jaeggi did not hold the relevant shares of Symbol stock until he exercised the stock option which, it is undisputed, he did during the relevant period. Accordingly, the branch of Jaeggi's motion seeking release of the restrained shares of Symbol stock is denied.

B.  The Bank of America Certificate of Deposit No. 91000039767747 (the CD)

The government alleges that six hundred ninety-eight thousand nine hundred eighty-one dollars ($698,981.00) of this asset are criminal proceeds. Jaeggi contends that in order to trace the CD to the sale of Symbol stock, the complaint was required to set forth how much the stock was inflated when cash proceeds were generated and that, in any event, the government would only be entitled to the difference between the value of the asset obtained absent the crime and the

4

value resulting from the crime. According to Jaeggi, even assuming the validity of the government's expert's analysis, the government would only be entitled to seize $6,097,251.00 of this asset.

The government alleges, *inter alia*, that on or about May 30, 2002, seven hundred thousand dollars ($700,000.00), of which six hundred ninety-eight thousand nine hundred eighty-one dollars and forty-two cents ($698,981.42) constitute criminal proceeds resulting from Jaeggi's exercise of stock options and/or sale of Symbol shares at inflated prices during the relevant period, that had been deposited into Bank of America account no. 510-02661, was used to purchase the CD. (Second Amended Complaint [Sec. Amend. Compl.], ¶¶ 59-60, 69)[2]. Those allegations are sufficient, at this stage of the litigation, to justify the government's restraint of this asset. Thus, the branch of Jaeggi's motion seeking release of this asset is denied.

C.  The Lien on Jaeggi's Residence[3]

Jaeggi contends that half the value of his current residence is not subject to forfeiture because no part of the CD allegedly containing criminal proceeds was used to pay for any part of the residence. According to Jaeggi, the CD was used as collateral to secure a loan, which could

---

[2] The prior motion practice pertained to Jaeggi's motion to dismiss the *initial* complaint filed by the government and, thus, focused solely on the allegations contained in that complaint. However, since Jaeggi's present application seeking release of the funds is premised upon current facts, including the current value of the assets and the substitution of the res, and not to the facts existing solely at the time that the initial complaint was filed, it is appropriate to consider all of the pleadings submitted in this action to date.

[3] Pursuant to a July 24, 2007 stipulation and order for substitution of the res, the lien was substituted for the government's restraint of forty-eight percent (48%) of the value of property located at 6 Cherub Court, East Setauket, New York, in order to permit Jaeggi to sell that property.

5

have been used by Jaeggi to pay for any number of expenses, not just repayment of a mortgage held on the residence. Jaeggi contends that, in any event, there is no basis for believing that forty-eight percent (48%) of the value of the residence is subject to forfeiture.

The government alleges that in May 2001, Jaeggi sold one hundred eighty-three thousand seven hundred fourteen (183,714) Symbol shares, of which one hundred seventy-three thousand five hundred ninety-two (173,592) constitute criminal proceeds. (Sec. Amend. Compl., ¶ 59). According to the government, two million five hundred thousand eight hundred fifty-three dollars and ten cents ($2,500,853.10) of the criminal proceeds from this stock sale was wired into Bank of America account no. 510-02661, held in the names of Jaeggi and Patti S. Jaeggi (Patti) (account no. 510-02661). (Id.). The government further alleges that in June 2001, four hundred thousand dollars ($400,000.00), all of which constitute criminal proceeds, were wired out of account no. 510-02661 for the purpose of purchasing the CD. (Sec. Amend. Comp., ¶ 61). According to the government, the Deposit Account and Security Agreement signed by Jaeggi and Patti on June 5, 2001 indicates that the purchase of the CD was to provide additional security for a loan extended to them by Bank of America. (Id. at ¶ 62). The government further alleges that on or about June 11, 2001, proceeds from the loan in the amount of three hundred ninety-seven thousand dollars ($397,000.00) were wired from Bank of America to Fleet Bank account no. 9408669630 (FB account no. 9408669630), held in the names of Jaeggi and Patti. (Id. at 63). In addition, the government alleges that on June 12, 2001, Fleet Bank issued a cashier's check in the amount of three hundred forty-eight thousand four hundred sixteen dollars and fifteen cents ($348,416.15), purchased with funds drawn from FB account no. 9408669630 and made payable to "Washington Mutual." (Id. at 64). According to the government, the cashier's check was used

6

to pay off mortgage no. 0372213727 held by Washington Mutual Bank (the WaMu mortgage) on the 6 Cherub Court premises. (Id.). The government alleges that three hundred forty-six thousand three hundred ninety-seven dollars ($346,397.00) of the three hundred forty-eight thousand four hundred sixteen dollars and fifteen cents ($ 348,416.15) represented payment of principal due under the WaMu mortgage and is approximately forty-eight percent (48%) of the appraised value of the Cherub Court premises on June 12, 2001. (Id. at 65). Thus, contrary to Jaeggi's contention, the allegations in the government's pleadings are sufficient, at this stage of the litigation, to justify the government's restraint of this asset, as the substituted res for the Cherub Court premises. Accordingly, the branch of Jaeggi's motion seeking the release of the lien on his residence is denied.

D.   Securities and Cash Restrained in Bank of America Account no. P62-032115

Jaeggi contends that the complaint fails to demonstrate that the securities and cash that were initially restrained in Bank of America account no. P62-032115 (account no. P62-032115)[4] are proceeds traceable to the alleged fraud. According to Jaeggi, two of the purported sales of Symbol shares were actually settlements of European collars, one of which occurred after the relevant period, and the complaint does not detail which of the seized securities can be traced to which option exercise, settlement or sales transaction. In addition, according to Jaeggi, sales that allegedly occurred in December 2003 occurred over a year after the relevant period. According to Jaeggi, three million four hundred twenty-three seven hundred sixty -three ($3,423,763.00) of

---

[4] According to Jaeggi, on October 18, 2006, the government agreed to let him liquidate some of the securities in this account in order to preserve their increase in investment value. The resulting cash proceeds from the sale of those securities is currently under restraint.

the six million one hundred twenty-six nine hundred seventy-nine dollars ($6,126,979.00), or fifty-six percent (56%) of the funds, used to purchase the restrained securities is not traceable to criminal conduct and should be released.

The government alleges, *inter alia*, that in May 2001, one hundred eighty-three thousand seven hundred fourteen (183,714) shares of Symbol held in account no. 207-00426, of which one hundred seventy-three thousand five hundred ninety-two (173,592) constituted criminal proceeds, were sold for a price of seven million five hundred sixty-four thousand four hundred fifty-one dollars and fifty-one cents ($7,564,451.51). (Sec. Amend. Compl. ¶ 59). According to the government, two million five hundred thousand eight hundred fifty-three dollars and ten cents ($2,500.853.10) of the criminal proceeds were wired into account no. 510-02661. (Id.).

In addition, the government alleges that in August 2002, ninety-eight thousand six hundred (98,600) shares of Symbol were purchased in account no. 510-02661 using money market funds traceable to criminal proceeds. (Id. at 70).[5]

The government further alleges that on or about January 8, 2003, one hundred twenty-one thousand five hundred nine (121,509) shares of Symbol in account no. 207-00426, all of which constitute criminal proceeds, were sold for a price of three million one hundred ninety-six thousand seven hundred one dollars and thirty cents ($3,196,701.30) and the entire amount was wired into account no. 510-02661. (Id. at 71). In addition, the government alleges that on or about January 22, 2003, forty-seven thousand five hundred forty-two (47,542) shares of Symbol, all of which constitute criminal proceeds, were transferred from account no. 207-00426 to

---

[5] Jaeggi fails entirely to address this allegation in his application. Thus, his contention that the government is presently restraining more assets in this account than can be traced to criminal proceeds is facially flawed.

8

account no. 510-02661. (Id. at 72).⁶

The government alleges that on or about January 29, 2003, one million dollars ($1,000,000.00), all of which constitute criminal proceeds, was transferred from account no. 510-02661 to Bank of America securities account no. 109-36703 (Account no. 109-36703), held in the name of Jaeggi and Patti. (Sec. Amend. Comp., ¶ 82). According to the government, from January 2003 through August 2003, various corporate bonds were purchased and sold on behalf of Jaeggi using money market funds derived from criminal proceeds in account no. 109-36703. (Id. at ¶ 83).

The government alleges that on or about August 1, 2003, the balance of Bank of America Account no. P62-032115 (account no. P62-032115) was zero dollars ($0.00). (Sec. Amend. Comp. ¶ 90). The government further alleges, *inter alia*, that (1) on or about August 13, 2003, ten thousand one hundred twenty-two (10,122) shares of Symbol, all of which constitute criminal proceeds, were transferred from account no. 510-02661 to account no. P62-032115; (2) on or about August 25, 2003, one hundred sixty-seven thousand two hundred forty-nine (167,249) shares of Symbol, of which one hundred thirty-six thousand twenty (136,020) constitute criminal proceeds, were transferred from account no. 510-02661 to account no. P62-032115; and (3) on or about August 25, 2003, all securities in account no 510-02661, which all constituted criminal proceeds and which had a fair market value at that time of three million seven hundred seventy-seven thousand ten dollars ($3,777,010.00), were transferred to account no. P62-032115. (Id. at ¶¶ 75-76, 79, 91-92, 94).

---

⁶ Jaeggi also fails to address this allegation in his application. Thus, as noted in the previous footnote, his contention that the government is presently restraining more assets in this account than can be traced to criminal proceeds is facially flawed.

The government further alleges that on or about August 28, 2003, the entire balance of account no. 109-36703, in the amount of one million thirty-five thousand nine hundred fifteen dollars and forty-one cents ($1,035,915.41) in money market funds, all of which constitute criminal proceeds, was transferred from account no. 109-36703 to Bank of America account no. P62-012971 (account no. P62-012971). (Id. at ¶¶ 83, 86 ). According to the government, in November 2003, one million twenty-five thousand dollars ($1,025,000.00) in securities were purchased in account no. P62-012971.

In addition, the government contends that from December 16, 2003 through and including December 19, 2003, all of the one hundred seventy-seven thousand three hundred seventy-one (177,371) shares of Symbol in account no. P62-032115, of which one hundred forty-six thousand one hundred forty-two (146,142) shares constitute criminal proceeds, were sold and the cash proceeds therefrom were held as money market funds in account no. P62-032115. (Id. at 95). According to the government, the amount realized from the sale of the shares constituting criminal proceeds was approximately two million four hundred twenty thousand seven hundred thirty-six dollars and eighty cents ($2,420,736.80). (Id.). The government maintains that certain securities purchased in February 2004 were allocated as non-criminal proceeds to approximate the proceeds from the sale of the thirty-one thousand two hundred twenty-nine (31,229) Symbol shares sold in December 2003 that were not treated as criminal proceeds. (Id. at 100).

The government alleges that on or about January 29, 2004, fourteen thousand seven hundred eighty-seven dollars and seventy-eight cents ($14,787.78) in money market funds and one million twenty-five thousand dollars ($1,025,000.00) in securities, all of which constitute criminal proceeds, were transferred from account no. P62-012971 to account no. P62-032115.

10

(Sec. Amend. Comp., ¶¶ 88, 96). According to the government, on or about February 2, 2004, the remaining balance of eight dollars and thirty-seven cents ($8.37), all of which constitute criminal proceeds, was transferred from account no. P62-012971 to account no. P62-032115. (Id. at 96).

The government alleges that as of April 30, 2004, approximately six million three hundred seventy-six thousand seven hundred dollars ($6,376,700.00) in equities and bonds derived from criminal proceeds were held in account no. P62-032115. (Sec. Amend. Compl. ¶ 98, Exhibit 1). Specifically, the government alleges that the equities and bonds are traceable to criminal proceeds derived from the transfer of criminal proceeds in the form of stock or funds from account nos. 207-00426 and 510-02661. (Id. at 99).

Contrary to Jaeggi's contention, the government's allegations are sufficient at this stage of the litigation to justify the restraint of all of Jaeggi's assets held in account no. P62-032115. Moreover, Jaeggi's contention that the May 2001 and January 2003 transaction were not sales of Symbol shares but, were, instead, settlements of European collars ignores the government's allegation that Jaeggi engaged in fraud, *inter alia*, by purchasing European collars in anticipation of "a significant decline in Symbol's stock price due to the eventual disclosure of Symbol's improper revenue recognition practices," which "enabled him to essentially lock-in his Symbol stock and options at the prices that existed on the days he purchased these collars." (Compl., ¶¶ 40-41). Moreover, the fact that one of the collars was settled after the relevant period is of no relevance, since the fraud occurred when Jaeggi purchased the collar, which was during the relevant period. In addition, since the government alleges that the Symbol shares which were sold in December 2003 were, themselves, criminal proceeds, the fact that Jaeggi sold those

shares after the relevant period does not render their restraint improper. Accordingly, the branch of Jaeggi's motion seeking release of the assets in account no. P62-032115 is denied.

E. The Funds in Account No. 207-00426.

Jaeggi contends that the government fails to allege where the eleven thousand seven hundred fifty-four dollars ($11,754.00) remaining in account no. 207-00426 came from or how it entered the account and, thus, has failed to trace this money to the alleged fraud.

The government contends that on February 1, 2000, the balance of Bank of America account no. 207-00426 was zero dollars. ($0.00). (Sec. Amend. Compl., ¶ 46). The government further alleges that as a result of stock options and stock splits in February 2000, April 2000, June 2000 and April 2001, Jaeggi accumulated three hundred five thousand two hundred twenty-three (305,223) shares of Symbol, all of which constitute criminal proceeds, and all of which were deposited in account no. 207-00426. (Sec. Amend. Compl., ¶¶ 47-51). Although the government alleges that Jaeggi sold some of the Symbol shares and wired the proceeds therefrom from account no. 207-00426 into account no. 510-02661 and other accounts and/or transferred shares of Symbol into account no. 510-02661, (Id. at ¶¶ 53-56), it is clear from the allegations that thirty-two thousand four hundred shares of Symbol remained in account no. 207-00426, of which all but three (3) are alleged to constitute criminal proceeds. In addition, the government alleges that an additional eleven thousand seven hundred fifty-four dollars and twenty-three cents ($11,754.23) from criminal proceeds was held in money market funds in account no. 207-00426 as of June 1, 2004. (Sec. Amend. Compl., ¶ 57). Accordingly, the government's allegations are sufficient, at this stage of the litigation, to warrant its restraint of the funds in account no. 207-

00426. Thus, the branch of Jaeggi's application seeking release of the funds in account no. 207-00426 is denied.

F. Release of Sufficient Funds to Pay Taxes and/or Living Expenses

Jaeggi's counsel contends that Jaeggi has no funds from which to pay his ongoing living expenses or his tax obligations and, thus, the Court should release sufficient assets to allow him to meet those obligations.

The majority of jurisdictions addressing challenges to pre-trial restraints of assets on the basis that those assets are needed to pay legal or living expenses have adopted the holdings of two seminal cases, United States v. Jones, 160 F.3d 641, 647 (10th Cir. 1998), and United States v. Farmer, 274 F.3d 800, 804-805 (4th Cir. 2001) (the Jones-Farmer Rule).[7] See, e.g. United States v. Jamieson, 427 F.3d 394, 406 n. 3 (6th Cir. 2005 (compiling cases from other circuits). Pursuant to the Jones-Farmer Rule, a post-restraint pre-trial hearing on a defendant's motion for release of assets for living and legal expenses is only required when the defendant (1) demonstrates to the court's satisfaction that he has no assets, other than those restrained, with which to retain private counsel and provide for himself and his family; and (2) makes a prima facie showing that the assets are not forfeitable. Jones, 160 F.3d at 647; Farmer, 274 F.3d at 804-805. The defendant bears the burden of persuasion on the first requirement, whereas the second requirement entails only a burden of production. Jones, 160 F.3d at 647. Only after a defendant

---

[7] Although Jones involved a criminal forfeiture, Farmer specifically held that assets "seized pursuant to civil forfeitures, based on the same allegedly illegal activities underlying the * * * criminal indictment[,] * * * places [the defendant] in the same position as a criminal defendant whose assets are seized pursuant to criminal forfeiture" and, thus, cases involving criminal forfeiture are analogous to cases involving civil forfeiture. Farmer, 274 F.3d 800, 804.

13

satisfies these initial burdens is the court required to conduct an adversarial hearing at which the government must establish probable cause to believe that the assets are forfeitable. Id. District courts have "broad discretion" to determine the need for post-restraint, pre-trial hearings. Farmer, 274 F.3d at 805.

Jaeggi has submitted only a conclusory allegation from his attorney and evidence of a tax obligation due to demonostrate that he has no assets, other than those currently under restraint, with which to pay his tax obligations and living expenses. In addition, as noted above and in the prior orders denying Jaeggi's motions to dismiss and for reconsideration, Jaeggi has not made a prima facie showing that the assets restrained are not subject to forfeiture.

The case relied upon by Jaeggi in purported support of his position, United States v. Madeoy, 652 F.Supp. 371 (D.D.C. 1987), is inapposite, as the defendant in that case provided memoranda specifying the need for the amount the defendant alleged he needed for living expenses, as well as two affidavits providing clear breakdowns of his living and occupational expenses, which the government did not contradict. To the contrary, Jaeggi has submitted no evidence regarding his tax obligations or living expenses. Accordingly, the branch of Jaeggi's application seeking release of sufficient funds to pay his tax obligations and living expenses is denied.[8]

---

[8] Jaeggi's remaining contention regarding the government's theory of inflation is more appropriate at trial, when the finder of fact can assess the validity of the government's theory and the weight to be accorded to it.

III. CONCLUSION

For the reasons stated herein, Jaeggi's motion is denied in its entirety.

SO ORDERED.

_____
SANDRA J. FEUERSTEIN
United States District Judge

Dated: October 17, 2007
Central Islip, New York

Copies to:

UNITED STATES ATTORNEY'S OFFICE
Eastern District of New York
Richard Thomas Lunger, Jr., Assistant United States Attorney
610 Federal Plaza
Central Islip, New York 11722


SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, New York 10022-6069